Ray D. Hacke, OSB #173647
PACIFIC JUSTICE INSTITUTE
317 Court St. NE, Ste. 202
Salem, OR 97301
(503) 917-4409 Phone
(916) 857-6902   Facsimile

Attorneys for Plaintiff
SHERRY H. DETWILER

## UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| SHERRY H. DETWILER,<br><br>                              Plaintiff,<br><br>v.<br><br>MID-COLUMBIA MEDICAL<br>CENTER, A Municipality, and DOES 1<br>THROUGH 50, Inclusive,<br><br>                              Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES FOR RELIGIOUS DISCRIMINATION IN VIOLATION OF TITLE VII [42 U.S.C. § 2000e-2]**<br><br>**JURY TRIAL REQUESTED** |

Plaintiff SHERRY H. DETWILER hereby alleges as follows:

## PARTIES

1.      Plaintiff is, and at all times herein was, a former employee of

Defendant MID-COLUMBIA MEDICAL CENTER ("MCMC" or the "Hospital")

and a practicing Christian who was placed on unpaid administrative leave on

October 19, 2021 and fired on December 20, 2021 for refusing, on religious

grounds, to receive a COVID-19 vaccine or, in the alternative, submit to weekly

nasal swab tests to determine whether she had been infected with COVID-19.

2.      Defendant MCMC is, and at all times herein was, a non-profit public benefit corporation that operates a hospital in The Dalles in the County of Wasco, Oregon and an employer within the definition of 42 U.S.C. § 2000e(b).

3.      The true names and capacities of Defendants DOES 1 THROUGH 50 (collectively the "DOES"), inclusive, are unknown to Plaintiff, who therefore sues said Defendants under such fictitious names.  Each Defendant designated herein as one of the DOES is legally responsible for the events and happenings herein referred to and proximately caused injuries and damages to Plaintiff thereby, as herein alleged.  Plaintiff will seek leave of this Court to amend this Complaint to show the DOES' names and capacities once they have been ascertained.

## JURISDICTION

4.      Plaintiff refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

5.      This Court has jurisdiction over the Defendants pursuant to 28 U.S.C. § 1331 because Plaintiff's action arises under the laws of the United States.

## VENUE

6.      Plaintiff refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

7.      Venue is proper in the Court's Portland Division because the events giving rise to this Complaint occurred in the County of Wasco and all of the agents, employees, or other persons working for, or in concert with, Defendant MCMC with regard to the events giving rise to this case are located in, employed in, or residents of the County of Wasco.

## GENERAL ALLEGATIONS

8.      Plaintiff refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

9.      In August 2021, at the height of the COVID-19 pandemic (the "Pandemic"), Oregon Governor Kate Brown ("Gov. Brown") sought to limit the spread of the potentially deadly coronavirus in the state's healthcare facilities by issuing an executive order (the "Mandate") requiring healthcare workers statewide to be vaccinated against COVID-19 by October 18, 2021.  *See* Or. Admin. R. 333-019-1010.  However, Gov. Brown's Mandate allowed healthcare workers to seek, and the healthcare providers who employed them to grant, exemptions from the vaccination requirement.  *Id.*, subsections (3)-(4).

10.      Plaintiff worked for MCMC as a Privacy Officer and the Director of Health Information ("DHIM") from September 14, 2020 through December 20, 2021.  Her job, an executive-level position, was purely administrative and did not involve working with patients, directly or otherwise.

11.      Plaintiff was responsible for ensuring MCMC's compliance with federal and state privacy laws concerning patients' protected health information, including the federal Health Insurance Portability Accountability Act ("HIPAA") of 1996.  In addition to overseeing a staff of nine, Plaintiff's duties included:

  a.  Managing the operations of MCMC's Health Information Management department;

  b.  Maintaining patient records pursuant to HIPAA regulations;

  c.  Documenting, investigating, and responding to patients' complaints concerning violations of HIPAA as well as MCMC's own privacy policies and procedures;

  d.  Serving on MCMC's committees concerning forms and policies;

  e.  Training employees and volunteers to ensure the security of patients' protected health information;

  f.  Serving as a contact for, and cooperating with, government authorities and privacy attorneys investigating breaches of MCMC's patient

health information systems, including providing access to records when necessary; and

g.   Getting MCMC's health record system back online if the system was failing to operate or taking steps to ensure greater protection of health records if the system was compromised.

12.   Plaintiff could perform most, if not all, of these duties remotely, via either telephone or her MCMC-issued laptop, and starting in November 2020 – two months after she was hired at MCMC – that is just what she did.  Most of her staff and committee meetings, in fact, took place via videoconference.

13.   Plaintiff had a private office in the Health Information Management department at MCMC's facility in The Dalles.  When working in her office during the Pandemic, Plaintiff kept her door closed and had minimal contact with other employees.  Plaintiff rarely came out of the office except to use the bathroom or obtain food or supplies.  When interacting with employees, Plaintiff followed all Pandemic-related protocols, including wearing a mask and social distancing.

14.   Starting in November 2020, Plaintiff worked remotely for stretches of varying lengths, none longer than ten days.  MCMC issued her equipment and a virtual private network that included Internet access for precisely that purpose.

15.   Even when she was on the Hospital's premises, much of her work was done through her MCMC-issued laptop, including conducting meetings.

16.   The Hospital also permitted at least two members of Plaintiff's staff to work remotely and offered that privilege to at least three other staffers under Plaintiff's supervision.

17.   Plaintiff is also a practicing Christian who believes her body is a "temple of the Holy Spirit" [1 Corinthians 6:19-20], which she is not to defile by taking in substances that the Bible explicitly condemns or which could potentially harm her body.

18.     When researching the COVID-19 vaccines currently available in the United States when Gov. Brown issued her Mandate, Plaintiff discovered that the vaccines were created from cell lines taken from aborted fetuses.  As a Christian, Plaintiff opposes abortion on religious grounds [*see*, e.g., Proverbs 6:16-17 (concerning hands that shed innocent blood being an "abomination" to God), Jeremiah 1:5 (concerning the idea that life begins in the womb), and Psalm 127:3 (concerning children being a blessing from the Lord)].  Plaintiff's research into the vaccines also uncovered information from the website for Center for Disease Control and Prevention's ("CDC") indicating that the vaccines contained neurotoxins, attenuated viruses, carcinogens (i.e., cancer-causing agents), chemical wastes, and other potentially harmful substances.

19.     After much prayer and consideration, Plaintiff determined that she could not, in good conscience in accordance with her faith's principles, defile her body by having injected into it a vaccine derived from the cells of babies whose lives were taken via abortion.  Accordingly, on September 28, 2021, Plaintiff sought from MCMC a religious exemption from Gov. Brown's Mandate.  A copy of Plaintiff's religious exemption request is attached hereto as **Exhibit "A."**

20.     MCMC approved Plaintiff's religious exemption request on October 1, 2021.  A copy of MCMC's approval letter is attached hereto as **Exhibit "B."**

21.     Among the accommodations that MCMC agreed to provide to Plaintiff were that Plaintiff had to (1) wear personal protective equipment ("PPE") – specifically, an N95 mask – at all times while in the office, and (2) submit to weekly antigen testing.  *See* Ex. "B."

22.     As of October 1, 2021, two types of tests for determining COVID-19 infections were available in the United States: One involved spitting saliva into a tube and submitting it to a lab for analysis. The other required the person being tested to insert into his or her nose a cotton swab dipped in ethylene oxide ("EtO").

The person being tested was to press the EtO-dipped swab against the skin inside each of his or her nostrils multiple times, swirl the swab around in a circular motion to collect mucus from the person's nasal tissues, then submit the swab to a lab for testing.

23.    Plaintiff's research into the nasal swab test uncovered information from multiple sources indicating that EtO is a carcinogenic substance.

24.    Not wanting to take EtO into her body and run the risk of suffering from cancer, Plaintiff again invoked her Christian beliefs concerning her body being a temple of God, requesting an alternative accommodation from MCMC. Plaintiff's request for an exemption from MCMC's COVID testing requirement is attached hereto as **Exhibit "C."**

25.    As an alternative to nasal swab testing, Plaintiff requested that she be allowed to submit to saliva testing through Oregon Health & Science University. Plaintiff also asked that she be allowed to work remotely full-time for the duration of Gov. Brown's Mandate.  Plaintiff believed working remotely would be reasonable because she could attend and conduct meetings via videoconference – as she had frequently done since November 2020 – and most of her duties did not require her presence at MCMC's facility.

26.    While the Hospital was "considering" Plaintiff's proposed accommodations, the deadline for compliance with Gov. Brown's Mandate – October 18, 2021 – came and went.  As a result, MCMC placed Plaintiff on unpaid leave on October 19, 2021.

27.    The same day MCMC placed her on unpaid leave, Plaintiff received an e-mail from Cheri McCall, the Hospital's Chief Human Resources Officer, stating that while MCMC had granted Plaintiff's request for a religious exemption from Gov. Brown's Mandate, the Hospital was denying Plaintiff's requested accommodations of saliva testing and full-time remote work.  With regard to saliva

testing, MCMC deemed it "impractical" because test results would not be available for 24 to 36 hours, and the Hospital claimed that it needed Plaintiff to be available on occasion for same-day reporting.

28.    As for full-time remote work, MCMC asserted that working remotely even part-time, as Plaintiff had done for the majority of her tenure at the Hospital, had created "a hardship on your department and team."  See Attached **Exhibit "D"** [a copy of Ms. McCall's e-mail to Plaintiff dated October 19, 2021].  The Hospital asserted that although it "had approved of [Plaintiff] working intermittently by remote … it has become clear that [she] worked beyond what was agreed to and your team has struggled."  *Id.*  The Hospital furthermore asserted that it had received "increased complaints and dissatisfaction from your team since you started to work remote [sic]," claiming that Plaintiff's team "has struggled" due to her not being on site at MCMC's facility and "has lost confidence in [her] ability to lead and guide the team and question [sic] some of your decision making."  *Id.*

29.    On information and belief, Plaintiff disputes the veracity of the Hospital's assertions set forth in the preceding paragraph.

30.    The Hospital also accused Plaintiff of the following [*see* Ex. "D"]:

a.  Hiring to work in her department someone from her church who was not qualified for the position instead of a qualified internal candidate;

b.  Treating a worker under her supervision poorly, including failing to provide the worker with guidance and support necessary to carry out the worker's duties;

c.  Failing to provide timely responses, and in some cases any responses, to employees' requests for assistance; and

d.  Asking employees to call Plaintiff on her cell phone, giving them the impression that she was not actually working from home.

31.     On information and belief, Plaintiff not only questions the veracity of the accusations set forth in the preceding paragraph but asserts that MCMC used them as a pretext for firing her on the basis of her religion.

32.     Ms. McCall concluded her e-mail to Plaintiff by asserting that Plaintiff would be on leave until October 30, 2021, by which time she needed to do one of two things: Comply with Gov. Brown's Mandate by receiving a COVID-19 vaccine, or comply with the terms of the religious exemption that MCMC had granted to her.  If she did neither, MCMC would terminate Plaintiff's employment.

33.     Nine days before MCMC's compliance deadline, on October 21, 2021, the Hospital had an extra key made for the door to Plaintiff's private office. Before then, Plaintiff had the only key and was the only person who could access the private office.  MCMC made the extra key without providing any notice to Plaintiff or giving her the opportunity to secure or remove personal items or documents, electronically stored information, or other items that, in her capacity as the Hospital's Privacy Officer, Plaintiff had a duty to keep under tight control.

34.     In making it possible for persons other than Plaintiff to access the private office and thereby obtain access to documents, electronically stored information, and other items Plaintiff had a duty to keep under tight control, the Hospital placed Plaintiff in a very vulnerable position given that she was on unpaid leave at the time.

35.     Also on October 21, 2021, without notice, the Hospital locked her out of access to her MCMC-issued laptop, making it impossible for Plaintiff to communicate via e-mail with her supervisor, her team members, and other Hospital staff.  Coupled with the making of the additional key to her office, the decision to lock Plaintiff out of her MCMC-issued computer at best implies, and at worst outright indicates, that the Hospital had already decided to terminate Plaintiff's employment regardless of what decision she made.

---

36.     Plaintiff neither received a COVID-19 vaccine – which she could not, in good conscience, do in accordance with her sincerely held religious beliefs – nor agreed to the terms of the religious exemption granted her by the Hospital, which she deemed unreasonable.  Accordingly, Plaintiff was ultimately fired.

37.     Before she was fired, but while still on unpaid leave, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on November 2, 2021.  Plaintiff also attempted to resolve her dispute with her employer through MCMC's internal grievance process.  The Hospital thus did not terminate Plaintiff's employment immediately, allowing her to remain on unpaid leave until the internal grievance process was complete.

38.     In response to Plaintiff's grievance, MCMC reiterated to Plaintiff on or about December 17, 2021 that the Hospital could not accommodate her requests that she be allowed to submit to saliva testing or that she be allowed to work 100% remotely.  The Hospital also gave Plaintiff until December 20, 2021 to agree to the terms of the religious exemption MCMC had granted – i.e., nasal swab testing and wearing a mask inside the office – or accept reassignment to an open position.

39.     When Plaintiff did neither, MCMC terminated her employment.

40.     After firing Plaintiff, MCMC hired an interim DHIM.  Not only did MCMC allow the interim DHIM – who is still employed at MCMC – to work part-time, the Hospital allowed the new DHIM to do so 100% remotely, thereby undermining the Hospital's position that it would impose an undue hardship on the Hospital, and on staff working under Plaintiff, to allow Plaintiff to do likewise.

41.     The EEOC issued a "right to sue" letter to Plaintiff on June 6, 2022. A copy of the letter is attached hereto as **Exhibit "E."**

42.     Pursuant to the "right to sue" letter, Plaintiff had ninety (90) days to file a lawsuit against her former employer, MCMC.  *See* Ex. "E."  As the 90-day filing period is set to expire on September 4, 2022, the herein lawsuit is timely

filed.  *See* Attached **Exhibit "F"** [a printout from the website TimeandDate.com showing the calculation of the 90-day filing deadline].

<u>**SOLE CAUSE OF ACTION:**</u>
**Violation of Title VII**
**[42 U.S.C. § 2000e-2]**

43.    Plaintiff refers to and hereby incorporates the foregoing paragraphs as though fully set forth herein.

44.    Title VII of the 1964 Civil Rights Act prohibits employers from discriminating on the basis of religion.  42 U.S.C. § 2000e-2(a)(1).

45.    For purposes of Title VII, "[t]he term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year …"  42 U.S.C. § 2000e(b).

46.    Defendant MCMC qualifies as an employer under Title VII.

47.    The term "religion," for purposes of Title VII, "includes all aspects of religious observance and practice, as well as belief …" 42 U.S.C. § 2000e(j).

48.    As a practicing Christian, Plaintiff belongs to a class of persons protected under Title VII.  42 U.S.C. § 2000e-2(a)(1).

49.    Plaintiff has a bona fide religious belief that her body is a temple of the Holy Spirit and, in accordance with that belief, cannot defile her body by taking into her body (1) a vaccine derived from the cells of babies whose lives were taken via abortion or whose manufacturer used cells from aborted fetuses in the testing and development of the vaccine, or (2) a substance that could potentially harm her body.

50.    Plaintiff's bona fide religious belief against taking vaccines whose manufacturers used cells from aborted babies in researching and developing the vaccines conflicted with her employment-related duty to receive a COVID-19

vaccine in accordance with Gov. Brown's Mandate, as the COVID-19 vaccines available on the market in 2021 were all made by manufacturers who used cells from aborted fetuses in the vaccines' testing and development.

51.     Plaintiff's bona fide religious belief against putting potentially harmful substances into her body conflicted with her employment-related duty, in lieu of taking a COVID-19 vaccine, to submit to nasal swab testing, as doing so would have required Plaintiff to take into her body the potentially cancer-causing substance of EtO.

52.     Plaintiff informed her employer, MCMC, of the conflicts between her religious beliefs and her employment-related duties. *See* Exs. "A" and "C."

53.     Defendant MCMC subjected Plaintiff to discriminatory treatment by demanding, under threat of placing her on unpaid leave and ultimately terminating her employment, that Plaintiff either receive a COVID-19 vaccine or, in the alternative, submit to nasal swab testing as a condition of receiving a religious exemption from Gov. Brown's Mandate.

54.     Although Defendant MCMC approved Plaintiff's request for a religious exemption from Gov. Brown's Mandate, the accommodation that MCMC offered – nasal swab testing – was unreasonable in light of Plaintiff's sincerely held religious belief that she cannot defile her body by taking a harmful substance into it. Plaintiff informed MCMC multiple times that the solution into which nasal swabs are inserted prior to placement against the skin inside one's nostrils contains a potentially cancer-causing substance, EtO, and yet MCMC repeatedly insisted that Plaintiff submit to such testing in the alternative to being unvaccinated.

55.     Plaintiff proposed reasonable alternatives that would not have required her to put harmful or biblically forbidden substances inside her body – namely, saliva testing and working remotely – but Defendant MCMC refused to

agree to those alternatives.  Accordingly, the Hospital did not make good-faith efforts to reasonably accommodate Plaintiff's bona fide religious beliefs.

56.    Defendant MCMC would have incurred no undue hardship by accommodating Plaintiff's religious beliefs in the manner she had proposed: Starting in November 2020, Plaintiff worked remotely for stretches of varying lengths, both from inside and outside her private office – in fact, MCMC issued her equipment and a virtual private network that included Internet access for precisely that purpose.  At least two members of Plaintiff's staff were also permitted by MCMC to work remotely, and MCMC offered that privilege to at least three of Plaintiff's other staffers.

57.    Based on the foregoing, Defendant MCMC has no legitimate, nondiscriminatory reason for its actions.

58.    The reasons Defendant MCMC gave for denying Plaintiff her requested accommodations, and ultimately firing her, are pretextual: The fact that the DHIM whom the Hospital hired to replace Plaintiff was allowed to work 100 percent remotely – an indicator that allowing a director-level employee to work from home did not, in fact, cause hardship to employees working under the DHIM or cause the MCMC's Health Information Management team to struggle, as the Hospital asserts.

59.    Religious discrimination is truly what motivated Defendant MCMC to get rid of Plaintiff: Although the Hospital did grant Plaintiff a religious exemption from receiving a COVID-19 vaccine, the Hospital insisted that Plaintiff submit to weekly nasal swab testing as a condition of that exemption, completely ignoring that Plaintiff's Christian faith prohibits her from defiling her body by taking harmful substances into it.  Plaintiff provided the Hospital with evidence from multiple sources that EtO, the chemical in which nasal swabs are dipped prior to

being swirled around inside one's nostrils, is a cancer-causing substance. The Hospital's insistence that Plaintiff submit to nasal swab testing compelled her to choose between violating her sincerely held religious beliefs and remaining employed – a choice that Title VII aims to protect employees from having to make.

60.    Based on the foregoing, Defendant MCMC has discriminated against Plaintiff in violation of Title VII.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant MCMC as follows:

### ON ALL CAUSES OF ACTION:

1.    For economic damages in an amount according to proof at trial;

2.    For non-economic damages in an amount according to proof at trial;

3.    For punitive damages in an amount according to proof at trial;

4.    For attorney's fees and costs associated with bringing and maintaining this action in accordance with the law; and

5.    For such other and further relief as the Court may deem proper.


Dated: August 31, 2022            PACIFIC JUSTICE INSTITUTE
                                  __/s/ RAY D. HACKE_____
                                  Ray D. Hacke
                                  Attorney for Plaintiff
                                  SHERRY H. DETWILER

## PROOF OF SERVICE

I am employed in the County of Marion, State of Oregon.  I am over the age of eighteen and not a party to the within action; my business address is 1850 45th Ave., Suite 33, Salem, OR 97305.

On or about August 31, 2022, I served the following documents on the interested parties by placing a true copy thereof enclosed in sealed envelope(s) addressed to said parties:

**COMPLAINT FOR DAMAGES FOR RELIGIOUS DISCRIMINATION IN VIOLATION OF TITLE VII [42 U.S.C. § 2000e-2]**

### PLEASE SEE ATTACHED SERVICE LIST

_____BY MAIL:  I am readily familiar with the firm's practice of collection and processing of correspondence for mailing.  Under that practice, it would be deposited with the U.S. postal service on that same date with postage thereon fully prepaid at Salem, Oregon in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

_ X _BY PERSONAL SERVICE:  I caused such envelope to be delivered by hand to the office of the addressee(s).

_____BY FACSIMILE TRANSMISSION:  The facsimile machine I used complied with California Rules of Court 2003(3) and no error was reported by the machine.  Pursuant to rule 2005(i), I caused the machine to print a record of the transmission, a copy of which is attached to this proof of service.

_____(State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

_ X _(Federal)  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on August 31, 2022, at Salem, Oregon.

*/s/ LAUREN PEFFERLE*
Lauren Pefferle

## SERVICE LIST

**Via Personal Service:**
Dennis Knox
Chief Executive Officer
Mid-Columbia Medical Center
1700 East 19th Street
The Dalles, OR 97058

# EXHIBIT "A"

OFFICE OF THE DIRECTOR
Office of the State Public Health Director



# COVID-19 Vaccine Religious Exception Request Form

I am requesting an exception from the COVID-19 vaccination on the basis of a sincerely held religious belief.

| Individual's name: | Date of birth: |
|---|---|
| Sherry Detwiler | 01/03/1976 |
| Phone number: | |
| 541-631-1532 | |
| Employer/Organization: | Job Title/Position: |
| Mid Columbia Medical Center | Director HIM/Privacy Officer |

## Please check the boxes below as appropriate and complete related questions:

☒ Receiving the COVID-19 vaccination conflicts with my religious observances, practices or beliefs as described below.

Please describe your religious belief and how it affects your ability to receive a COVID-19 vaccination

See exemption request

I certify the above information to be true and accurate and that I sincerely hold the religious beliefs described above.

| Signature: | Date: |
|---|---|
| | 9/30/2021 |

Please note that if your exception request is approved, you may be required by your employer or other responsible party to take additional steps to protect you and others from contracting and spreading COVID-19. Workplaces are not required to provide this exception accommodation if doing so would pose a direct threat to the excepted individual or others in the workplace or would create an undue hardship.

**Document accessibility:** For individuals with disabilities or individuals who speak a language other than English, OHA can provide information in alternate formats such as translations, large print, or braille. Contact the Health Information Center at 1-971-673- 2411, 711 TTY or COVID19.LanguageAccess@dhsoha.state.or.us.

OHA 3871 (8/25/2021)

9/28/2021

Sherry Detwiler
3454 Royal Crest Dr. E.
The Dalles, OR 97058

Mid-Columbia Medical Center
1700 E. 19th St.
The Dalles, OR 97058

To Whom It May Concern,

I am a Christian seeking religious exemption from the "Covid-19 Vaccination Requirement".

I am requesting a religious accommodation under federal law: Title VII of the Civil Rights Act of 1964
[Title VII].

My religious beliefs are sincerely held.

It is against my faith and my conscience to commit sin. Sin is anything that violates the will of God, as set
forth in the Bible, and as impressed upon the heart of the believer by the Holy Spirit. In order to keep
myself from sin, and receive God's direction in my life, I pray and ask God for wisdom and direction
daily. As part of my prayers, I have asked God for direction regarding the current COVID shot
requirement. As I have prayed about what I should do, the Holy Spirit has moved on my heart and
conscience that I must not accept the COVID shot. If I were to go against the moving of the Holy Spirit, I
would be sinning and jeopardizing my relationship with God and violating my conscience.

Because the body is the temple of the Holy Spirit, we are compelled by Scripture to follow God's law
when choosing what to put into it. "Do you not know that you are God's temple and that God's Spirit
dwells in you? If anyone destroys God's temple, God will destroy him. For God's temple is holy, and you
are that temple." I Corinthians 3:16-17 ESV

As a Christian protecting my body from defilement according to God's law, I invoke my religious right to
refuse any vaccine which utilized abortion-derived cell lines at any stage of the creation of the vaccine.
Further, insofar as the vaccines also contain neurotoxins, hazardous substances, attenuated viruses,
animal parts, foreign DNA, albumin from human blood, carcinogens and chemical wastes that are
proven harmful to the human body, I find injection of the same to be in direct conflict with my Christian
duty to protect my body as the temple of the Holy Spirit. Source:

https://www.cdc.gov/vaccines/pubs/pinkbook/downloads/appendices/b/excipient-table-2.pdf

(last visited 9/28/2021)

I am therefore asking for an exemption from the COVID shot directive so that my conscience can remain
clear before God. Thank you for your consideration.

Sherry Detwiler, RHIA

# EXHIBIT "B"



October 1, 2021

Sherry Dewtiler
3454 Royal Crest Drive, East
The Dalles, OR 97058

Dear Sherry,

This letter is in response to your request for religious accommodation received on September 30, 2021 regarding receiving the COVID-19 vaccine as mandated by OAR 333-019-1010. The following decisions are based on your OHA 3870 or OHA 3871 form submitted to our organization.

Based on the information supplied we are ☒ **Approving**    ☒ **Denying** your request for accommodation based on the following: The religious exception is approved, however, you are not willing to meet the testing condition, so it is declined and moved to a medical accommodation request. Medical packet has been sent to Employee Health for review

**Approved Accommodations:**

- Weekly antigen testing
- Wearing personal protective equipment (PPE) at all times, unless eating or drinking

**Declining Reason**
- Weekly antigen testing – moving into medical request

If you have further questions or additional information, please reach out to Human Resources and we are happy to assist you.

If your request for accommodations were denied, you will need to comply with the mandate by October 18, 2021, or it will be considered a resignation of your position with Mid-Columbia Medical Center.

Respectfully,

Cheri McCall,
Director, Human Resources

cc: confidential health file (personnel)

# EXHIBIT "C"

To Whom It May Concern,

I am a Christian seeking religious exemption from the "Covid-19 Testing Requirement". This requirement by Mid-Columbia Medical Center for any staff that have been approved for religious exemption.

I am requesting a religious accommodation under federal law: Title VII of the Civil Rights Act of 1964 [Title VII].

My religious beliefs are sincerely held.

It is against my faith and my conscience to commit sin. Sin is anything that violates the will of God, as set forth in the Bible, and as impressed upon the heart of the believer by the Holy Spirit. In order to keep myself from sin, and receive God's direction in my life, I pray and ask God for wisdom and direction daily. As part of my prayers, I have asked God for direction regarding the current COVID testing requirement. As I have prayed about what I should do, the Holy Spirit has moved on my heart and conscience that I must not participate in COVID testing that causes harm. If I were to go against the moving of the Holy Spirit, I would be sinning and jeopardizing my relationship with God and violating my conscience.

According to 1 Corinthians 6:19-20 Do you not know that your bodies are temples of the Holy Spirit, who is in you, whom you have received from God? You are not your own; you were bought at a price. Therefore honor God with your bodies. (NIV)

According to U.S. Environmental Protection Agency's (EPA's) 2005 *Guidelines for Carcinogen Risk Assessment* https://cfpub.epa.gov/ncea/iris/iris_documents/documents/toxreviews/1025tr.pdf (last visited 9/30/2021)

Ethylene Oxide (EtO) is carcinogenic to humans. There is clear evidence that EtO is genotoxic and evidence supports a mutagenic mode of action, key precursor events are anticipated to occur in humans and progress to tumors, including evidence of chromosome damage in humans exposed to EtO.

This is important to note, because medical equipment is sterilized by a direct oxidation process which is predominantly EtO, exposure in the chlorohydrin process, this EtO is mixed with other chemicals.

The same EPA document states some of the cancers have a 15-year delay, however the multiplication of morphed DNA results in multiple cancerous states.

The nasal swabs used for testing COVID-19 are commonly referred to as "Ethylene Oxide Swabs".

According to the NIH, The Residual levels of EtO recovered from cotton swabs have adverse effects on DNA profiles. https://pubmed.ncbi.nlm.nih.gov/28063580/ (last visited 9/29/2021)

As a Christian protecting my body from defilement according to God's law, I invoke my religious right to refuse any testing which would alter my DNA and has been proven to cause cancer. I find testing with carcinogens and chemical waste to be in direct conflict with my Christian duty to protect my body as the temple of the Holy Spirit.

I am therefore asking for an exemption from the COVID testing directive so that my conscience can remain clear before God. Thank you for your consideration.

Sherry Detwiler, RHIA

OFFICE OF THE DIRECTOR
Office of the State Public Health Director



## COVID-19 ~~Vaccine~~ *Medical Testing* Medical Exception Request Form

I am requesting an exception from the COVID-19 vaccination requirement on the basis of a diagnosed physical or mental condition that limits my ability to receive the COVID-19 vaccination, as certified by my medical provider below.

| Individual's name: Sherry Detwiler | Date of birth: 1-3-1976 |
|---|---|
| Phone number: 541.631.1532 | |
| Signature: | Date: 9-29-21 |
| Employer/Organization: Mid Columbia Medical Center | Job Title/Position: Provider OFFicers Div. of Health Info |

Please note that if your exception request is approved, you may be required by your employer or other responsible party to take additional steps to protect you and others from contracting and spreading COVID-19. Workplaces are not required to provide this exception accommodation if doing so would pose a direct threat to the excepted individual or others in the workplace or would create an undue hardship.

## Statement from Medical Provider

Your patient, named above, has requested an exception to the COVID-19 ~~vaccination~~ *medical testing* requirement due to a medical condition. Please provide the information below.

## Please check an option below and complete related questions:

☒ The patient should not receive the COVID-19 ~~vaccination~~ *Medical Testing* due to a medical condition.

What is the medical condition that prevents them from receiving the COVID-19 ~~vaccination~~? *medical testing*? Sherry has a tendency to often have nose bleeds. She also has chronic sinusitis. This would create a negative environment for her nose bleeds and sinusitis

☒ Yes ☐ No  Is the medical condition permanent?

☐ Yes ☐ No  Is the medical condition temporary? If yes, what is the expected duration?

Please describe how this medical condition impacts their ability to receive the COVID-19 ~~vaccination~~. *Medical Testing*. Not having medical Testing would lessen nose bleeds and chronic sinusitis, Keeping Sherry healthier and more focused on her job.

1 of 2

OHA 3870 (8/25/2021)

☐ The patient may not receive a certain type of COVID-19 vaccination. The patient may receive a vaccination manufactured by          .

☐ The patient may receive a COVID-19 vaccination.

I certify the above information to be true and accurate.

| Printed name of medical provider: Ronda Mattey, D.C. | Date: 9-29-21 |
| Signature of medical provider: | Work address: 1064 13th Ave S. Nampa ID 83651 Work telephone number: 208. 461. 4227 |

**Document accessibility:** For individuals with disabilities or individuals who speak a language other than English, OHA can provide information in alternate formats such as translations, large print, or braille. Contact the Health Information Center at 1-971-673- 2411, 711 TTY or COVID19.LanguageAccess@dhsoha.state.or.us.

OHA 3870 (8/25/2021)

9/30/2021

Sherry Detwiler
3454 Royal Crest Dr. E.
The Dalles, OR 97058

Mid-Columbia Medical Center
1700 E. 19th St.
The Dalles, OR 97058

Dear Dale, Cheri, and Dennis:

I understand that "Employers of healthcare providers or healthcare staff, contractors and responsible parties who grant an exception to the vaccination requirement should take reasonable steps to ensure that unvaccinated healthcare providers and healthcare staff are protected from contracting and spreading COVID-19." Per page 6 of the Temporary Administrative Order PH38-2021, Chapter 333 OHA, Public Health Division, 8/25/2021.

Based on my religious belief, I am requesting reasonable accommodation under ADA, to perform my duties as Director of Health Information/Privacy Officer from a remote location, 100% of the time; during this time of vaccine mandate and/or testing mandate. Several employees of Mid-Columbia Medical Center (MCMC) have already been offered, taken the opportunity and had proven success; thus this accommodation does not create undue hardship for the employer.

Concerns addressed:

I can attend meetings via Zoom, as the precedent has been set for the last year. Even before COVID was declared a pandemic, we had and still have, teleconference lines for those who could not/did not attend meetings in person.

Hotspots can be in place, in case of internet service being dropped.

Hours can be adjusted for power outages.

Many successful Health Information Management (HIM) teams run the entire department remotely, regular check-ins with staff, clear lines of communication will help the department be connected. This has been the direction of HIM for over sixteen years.

This accommodation is a reasonable step to ensure the unvaccinated staff are protected from contracting and spreading Covid-19 as required by OAR 333-019-1010.

Sincerely,

Sherry Detwiler, RHIA

From: Cheri McCall <CheriM@mcmc.net>
To: Dale Lepper <DaleL@mcmc.net>, Sherry Detwiler <SherryD@mcmc.net>
Cc:
Bcc:
Date: Tue, 19 Oct 2021 15:22:28 -0700
Subject: Re: reasonable accommodation
Sherry,

I am sorry this has taken some time to respond to. I knew that you had applied for a medical exception based on one of the two conditions of your approved religious exceptions, referring to the "weekly antigen testing". I have been made aware that the medical exception has been denied. I do not know the details of that denial and you would need to speak with Employee Health regarding the details.

I can however confirm, you still have an approved religious exception, but based on the two conditions of weekly antigen testing and wearing of the PPE at all times based on the state mandate. You will need to reach out to Connie Jubitz to arrange the weekly antigen testing date and time. MCMC does not want to lose any staff due to this mandate and have worked hard to meet both the mandate and staff needs.

However, in my discussion with your supervisor Dale Lepper on the request of working 100% remote, he is not comfortable approving that request as it is a hardship on your department and team. We have had increased complaints and dissatisfaction from your team since you started to work remote. Dale had approved of your working intermittently remote, however, it has become clear you worked beyond what was agreed to and your team has struggled.

Your team has lost confidence in your ability to lead and guide the team and question some of your recent decision making. Dale can go into detail of these areas for specifics.

- Recent hire. We became aware of your selecting an acquaintance from church with no HIM experience over an experienced current staff within HIM. You did not set up any interviewing process and were actually counseled by HR recruiter that this person did not have any experience and you had an internal candidate.
- Your team has shared their "observation" of your ill treatment of another co-worker. Also not responding to this co-worker on critical request for guidance on critical needs to the organization. The need for support is at the director level.
- Response to your team is often delayed or null
- Asking your team to call you on your "cell phone" leaving them with the perception that you are not working from home.

Although your perception is you are able to successfully work remote and support your team, the consistent feedback is that the department lacks support, structure and guidance during a time when leaders need to be focused on their teams and supporting them through the challenges facing healthcare.

Therefore, we are placing you on unpaid leave as outlined in the attached document, and you will not have access to your PTO or EIH during this time. We will move you to an unpaid leave status through October 30, 2021 or until you fall into compliance with the mandate or approved religious exception. If you choose not to meet the expectations, your employment with MCMC will end on October 31, 2021.

We will be sending a letter to you via the mail outlining the above process.  I have also attached the No Action document you received last week.

Please let me know if you have any further questions.
Respectfully,
Cheri

# EXHIBIT "E"

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Seattle Field Office**
909 First Avenue, Suite 400
Seattle, WA 98104
(206) 576-3000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
### (This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 06/06/2022

**To:** Sherry Detwiler
3454 Royal Crest Dr. E.
THE DALLES, OR 97058
Charge No: 551-2022-00489

EEOC Representative and email:  Bryne Moore
Investigator
bryne.moore@eeoc.gov

---

## DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 551-2022-00489.

On Behalf of the Commission:

June 6, 2022                           _____  For
Date                                                      Elizabeth Cannon
                                                          Director

**Cc:**
Caroline Janzen
Janzen Legal Services, LLC - Rugged Law
caroline@ruggedlaw.com

James M Barrett
Ogletree Deakins Law Firm
james.barrett@ogletreedeakins.com

Florence Z Mao
OGLETREE, DEAKINS, NASH, SMOAK & STWEART, P.C.
florence.mao@ogletree.com


Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC
*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a FOIA Request or 2) a Section 83 request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your request for the charge file promptly to allow sufficient time for EEOC to respond and for your review. Submit a signed written request stating it is a "FOIA Request" or a "Section 83 Request" for Charge Number 551-2022-00489 to the District Director at Nancy Sienko, 450 Golden Gate Avenue 5 West PO Box 36025

San Francisco, CA 94102.

You can also make a FOIA request online at https://eeoc.arkcase.com/foia/portal/login.

Enclosure with EEOC Notice of Closure and Rights (01/22)

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA Requests and Section 83 Requests, go to: https://www.eeoc.gov/eeoc/foia/index.cfm.

### Notice Of Rights Under The ADA Amendments Act OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system**.**

- ✓ **Only one** major life activity need be substantially limited.

- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

- ✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or "**in remission**" (e.g., cancer) is a disability if it **would be substantially limiting when active**.

- ✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- ✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

- ✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

- ✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability".

***Note:*** *Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For moreinformation, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

# EXHIBIT "F"

# Date Calculator: Add to or Subtract From a Date

Enter a start date and add or subtract any number of days, months, or years.

Count Days    **Add Days**    Workdays    Add Workdays    Weekday    Week №

Advertising

From **Monday, June 6, 2022**
Added 90 days

## Result: Sunday, September 4, 2022

### Calendar showing period from June 6, 2022 to September 4, 2022

| June 2022 | | | | | | | July 2022 | | | | | | | August 2022 | | | | | | | September 2022 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 24 days added | | | | | | | 31 days added | | | | | | | 31 days added | | | | | | | 4 days added | | | | | | |
| Sun | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Mon | Tue | Wed | Thu | Fri | Sat |
| | | | 1 | 2 | 3 | 4 | | | | | | 1 | 2 | | 1 | 2 | 3 | 4 | 5 | 6 | | | | | 1 | 2 | 3 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 26 | 27 | 28 | 29 | 30 | | | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 28 | 29 | 30 | 31 | | | | 25 | 26 | 27 | 28 | 29 | 30 | |
| | | | | | | | 31 | | | | | | | | | | | | | | | | | | | | |

☐ = Start date (Jun 6, 2022)    ☐ = Final result date (Sep 4, 2022)



**Time & Date Calculator App for iOS**

See how long remains before a deadline or exactly when those 30 days are up.



© Time and Date AS 1995–2022